**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re:                                                                                          Chapter 7

RONALD GALLEN,                                                                 Case No. 14-12412 (SHL)

                            Debtor.

------------------------------------------------------------------x

SAMUEL SHARMAT,

                            Plaintiff,

                        v.                                                                Adv. Proc. No. 14-02406 (SHL)

RONALD GALLEN,

                            Defendant.

------------------------------------------------------------------x

## POST-TRIAL MEMORANDUM OF DECISION

**A P P E A R A N C E S:**

**ZANE AND RUDOFSKY**
*Counsel for Plaintiff*
The Starrett Lehigh Building
601 West 26th Street, Suite 1111
New York, NY 10001
By:    Edward S. Rudofsky, Esq.

**RONALD D. GALLEN**
*Pro Se*
572 Atlantic Ave., Apt. 3L
Brooklyn, NY 11217

**SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE**

       Before the Court are the merits of the above-captioned adversary proceeding commenced

by Samuel Sharmat (the "Plaintiff" or "Dr. Sharmat") in the Chapter 7 case of Ronald Gallen

(the "Defendant" or "Mr. Gallen"). The Plaintiff contends that certain money owed to him by

the Defendant cannot be discharged in this bankruptcy pursuant to Sections 523(a)(2)(A) and

(a)(4) of the Bankruptcy Code. After trial in this case and for the reasons set forth below, the Court disagrees and finds that the debt owed to the Plaintiff is dischargeable. This Decision constitutes the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT[1]

### A. Background of Lafayette/Prince Services, LLC

The Plaintiff is a medical doctor who has been practicing since 1999, when he received his medical degree. *See* Transcript of Trial Held on January 20, 2016 ("Trial Tr.") 14:4–15 [ECF No. 13]. The Defendant is a financial counselor and has no medical background. *See* Trial Tr. 68:18–20, 81:24–25. The parties met in or around summer 2011, at which time the Plaintiff mentioned his idea for creating a group practice and the Defendant expressed interest in the idea. *See* Trial Tr. 16:14–17. During the summer of 2011, the parties communicated and met multiple times to discuss the idea. *See* Trial Tr. 16:14–24, 17:4–9. During this "courting" period, Mr. Gallen invited Dr. Sharmat to his East Hampton home, drove a BMW automobile, and dined with Dr. Sharmat at various expensive restaurants. *See* Trial Tr. 48:4–17, 63:11–15, 86:19–87:24. Prior to going into business with Mr. Gallen, Dr. Sharmat "had an impression of Mr. Gallen as someone who made a lot of money, had a lot of money, knew how to make a lot of money, and that his expertise was greatly superior to mine in that area." Trial Tr. 68:10–17. Dr. Sharmat further believed that Mr. Gallen intended to and did give the impression that he had significant financial resources and business expertise. *See* Trial Tr. 18:7–19, 29:17–25, 51:11–14. Mr. Gallen believed that he "was just the last in a long line of people" whom Dr. Sharmat

---

[1] These factual findings are based on the credible evidence presented to the Court at trial in this matter on January 20, 2016.

2

solicited to undertake the business venture and that Dr. Sharmat "claim[ed] expertise in all kinds of business activities." Trial Tr. 12:1–6.

Ultimately, as a result of the parties' discussions, in November 2011, they formed Lafayette/Prince Services, LLC ("L/P Services") to serve as a diagnostic medical center. *See* PX-1 (engagement letter from Danziger & Markhoff LLP); PX-2 (Articles of Incorporation of Lafayette/Prince Services, LLC); Trial Tr. 59:5–14. Mr. Gallen alone signed the articles of incorporation as "Organizer." PX-2 at 2. The parties did not execute an operating agreement or any other written agreement that described how L/P Services was to be operated. *See* Trial Tr. 20:3–9. Dr. Sharmat later became a member of and invested $65,000 in L/P Services. *See* PX-5 ¶ 1.

In December 2011, L/P Services executed a lease for space at 270 Lafayette Street, Suite 500, New York, NY (the "Lease"). *See* PX-3; Trial Tr. 20:10–24. Dr. Sharmat signed the Lease on behalf of L/P Services as "Managing Member." *See* PX-3 at 5; Trial Tr. 64:1–8. Mr. Gallen did not sign the Lease. *See* PX-3 at 5. In connection with the Lease, Dr. Sharmat and Mr. Gallen provided the landlord ROC-Lafayette Associates, LLC (the "Landlord") with a "Good Guy Guaranty" (the "Guaranty"), which provided that both individuals would guarantee the rent and other financial obligations under the Lease. *See* PX-3, Exh. C. The Guaranty stated:

> Guarantors do hereby personally, unconditionally, absolutely, jointly and severally agree to guarantee all monetary obligations of Tenant to Owner to pay Minimum Rent, Additional Rent and all other monetary charges and fees due under the Lease payable by Tenant through the date (the "Liability Date") which is the later to occur of (A) the date which is 90 days after the date Tenant delivers to Landlord notice (the "Vacate Notice") that Tenant intends to vacate the Demised Premises and surrender vacant possession of the Demised Premises by such date, or (B) the Vacate Date (as hereinafter defined), provided, however, that if Tenant shall have failed to deliver the Vacate Notice to Landlord, then the Liability Date shall be the date which is 90 days after the Vacate Date. In addition to the foregoing, Guarantors hereby personally, unconditionally, absolutely, jointly and severally agree to guaranty all costs and fees ("Collection Costs") of

3

> collection and enforcement, including without limitation, reasonable attorneys'
> fees and disbursements, in connection with either Tenant's or Guarantor's
> obligations and under the Lease and this Guaranty, as the case may be, regardless
> whether such costs and fees are incurred after the Liability Date.

PX-3, Exh. C at 22–23. Thus, the Guaranty provided that if the guarantors gave the Landlord notice to vacate 90 days in advance and vacated the premises within the 90 days, the guarantors would not be further obligated under the Lease. *See* PX-3, Exh. C at 22. Dr. Sharmat did not read the Lease or the Guaranty primarily because it is difficult for him to read long documents due to his Attention Deficit Disorder. *See* Trial Tr. 22:17–23. Dr. Sharmat instead relied on Mr. Gallen to explain the Lease and the Guaranty to him. *See* Trial Tr. 22:20–25. Dr. Sharmat claims that he understood the Guaranty to mean that he would be liable for rent only as long as they occupied the premises. *See* Trial Tr. 24:5–7, 24:12–14. Mr. Gallen understood the Guaranty to mean that they would not be liable for any rent as long as they had given the 90-day notice to vacate and were no longer on the premises after that time. *See* Trial Tr. 43:5–15, 90:14–17.

L/P Services moved into the leased premises in January 2012 and the business opened in the beginning of February 2012. *See* Trial Tr. 24:20–23. But the parties' partnership was not successful. *See* Trial Tr. 24:24–25:14, 66:18–25. According to Dr. Sharmat, he and Mr. Gallen had difficulties working together as soon as L/P Services began operating. *See* Trial Tr. 25:4–14. In January 2012, less than one month after entering into the Lease, Dr. Sharmat requested to be bought out. *See* Trial Tr. 24:24–25:18. On April 17, 2012, the parties executed a letter agreement regarding the buy-out of Dr. Sharmat's interest in L/P Services (the "Termination Agreement"). *See* PX-5 (Letter re: Termination of Interest in Lafayette/Prince Services, LLC). The Termination Agreement provided that Dr. Sharmat would surrender and assign all of his interests in L/P Services to Mr. Gallen and that Mr. Gallen would return Dr. Sharmat's total

4

investment—acknowledged in the Termination Agreement as $65,000—in two installments: $50,000 upon execution of the Termination Agreement and $15,000 on May 15, 2012. *See* PX-5 ¶ 1. Additionally, Mr. Gallen and L/P Services agreed to release and indemnify Dr. Sharmat from a variety of obligations, including the Guaranty. *See* PX-5 ¶ 4. The release covered:

> liabilities, expenses, or any third party claims previously incurred in connection with the LLC, including but not limited to (i) any claims, liabilities or expenses arising under or in connection with the "good guy" guarantee given by you, or otherwise, in connection with the lease of the LLC's premises at 270 Lafayette Street – Suite 500, New York, New York (the "Premises") . . . .

*Id.*[2]  Upon executing the Termination Agreement, Mr. Gallen paid $50,000 to Dr. Sharmat. *See* Defendant's Written Direct ¶ 5 [ECF No. 10]; PX-6 (check to Dr. Sharmat for $50,000). To date, Mr. Gallen has not paid the remaining $15,000 owed under the Termination Agreement. *See* Defendant's Written Direct ¶ 5; Trial Tr. 28:19–23, 29:4–10.

By July 2012, Mr. Gallen realized that L/P Services would not be successful. *See* Trial Tr. 94:3–13. He decided to vacate the leased space. *See* Trial Tr. 94:4–11. He claims that he gave the Landlord oral notice of L/P Services' intent to vacate the premises on August 1, 2012. *See* Trial Tr. 89:14–22. But Mr. Gallen gave no written notice and obtained no written acknowledgement from the Landlord of his alleged oral notice. *See* Trial Tr. 89:20–90:4. After August 1, 2012, Mr. Gallen continued to receive rent notices from the Landlord. *See* Trial Tr. 90:20–22. Mr. Gallen claims that the approximately $53,000 deposit held by the Landlord would almost exactly cover the remaining three months' rent owed to the Landlord, which would be $52,500. *See* Trial Tr. 45:5–15, 46:23, 91:5–8. He did not consult with an attorney about the termination of the Guaranty but told Dr. Sharmat "that he had nothing to worry about because

---

[2]    Also on April 17, 2012, the parties executed an agreement under which Dr. Sharmat would lease office space from L/P Services (the "MSO Agreement"). *See* PX-4 (agreement between L/P Services and Samuel L. Sharmat M.D., P.C.). Thus, under the MSO Agreement Dr. Sharmat essentially become a tenant of L/P Services. *See* PX-4; Trial Tr. 28:4–9.

5

[L/P Services] had three months' rent posted and that was the extent of the liability." Trial Tr. 90:11–17. The parties disagree on whether the oral notice allegedly given by Mr. Gallen to the Landlord was legally sufficient under the Guaranty.

### B. The State Court Action

In January 2013, the Landlord commenced a state court action against L/P Services under the Lease, and against Mr. Gallen and Dr. Sharmat personally under the Guaranty. *See* PX-7. The state court action sought unpaid rent and damages in the principal sum of $112,007.71, plus interest, costs, and fees. *See* PX-7 ¶¶ 11, 17, 21. The Landlord's complaint does not set forth whether it received any oral notice from Mr. Gallen about L/P Services' intent to leave the premises. In July 2013, Dr. Sharmat settled the case with the Landlord and paid $40,000 to the Landlord. *See* PX-9 ¶ 1. In return, Dr. Sharmat was assigned all of the Landlord's claims against L/P Services and Mr. Gallen, which totaled $112,007.71. *See* PX-9 ¶¶ 1, 6.

### C. Dr. Sharmat's Claims

In June 2014, Dr. Sharmat sued Mr. Gallen and L/P Services in state court for the assigned claim of $112,007.71, plus Dr. Sharmat's direct claims of $15,000 (*i.e.*, the unpaid balance of the buy-out of Dr. Sharmat's interest in L/P Services) and $40,000 (*i.e.*, Dr. Sharmat's settlement of the Landlord's claim). *See* PX-13.[3] Mr. Gallen filed for Chapter 7 bankruptcy on August 21, 2014. *See* PX-14. In this adversary proceeding, Dr. Sharmat does not dispute that the assigned claim of $112,007.71 is dischargeable. *See* Trial Tr. 8:16–18; Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 33 [ECF No. 14]. But he argues that his direct claims totaling $55,000 are non-dischargeable because they are based on Mr. Gallen's alleged

---

[3] It is unclear how Dr. Sharmat could recover both the $112,007.01, and the $40,000, but that issue is not currently before the Court.

false pretenses and misrepresentations. *See* Complaint to Determine Dischargeability of a Debt ¶ IV [ECF No. 1]; *see also* PX-13 ¶¶ 32–43.

Dr. Sharmat claims that he was materially misled into investing in L/P Services because Mr. Gallen's statements, promises, and representations were inaccurate and misleading. *See* Trial Tr. 9:5–14; Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 48. Further, Dr. Sharmat argues that Mr. Gallen misrepresented that he could run a successful business. *See* Trial Tr. 52:15–16. With respect to the $40,000, Dr. Sharmat asserts that Mr. Gallen misrepresented the nature of the Guaranty. *See* Trial Tr. 9:15–10:8, 89:14–90:7; Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 68. Specifically, Dr. Sharmat argues that the "Guaranty on its face required 90 days written notice to the Landlord, which Gallen admitted was not given." *See* Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 28; *see also* Trial Tr. 10:1–4.

## **CONCLUSIONS OF LAW**

### A. The Legal Standards

Section 523 of the Bankruptcy Code excepts certain debts from discharge. *See* 11 U.S.C. § 523. "The party seeking an exception to discharge bears the burden of proof by a preponderance of the evidence." *Benzaquen v. Rabinowitz* (*In re Rabinowitz*), 508 B.R. 874, 879 (Bankr. S.D.N.Y. 2014) (citing *Grogan v. Garner*, 498 U.S. 279, 285 (1991)). Furthermore, exceptions to discharge are construed narrowly. *See id.*; *see also Andy Warhol Found. for Visual Arts, Inc. v. Hayes* (*In re Hayes*), 183 F.3d 162, 167 (2d Cir. 1999). This narrow construction effectuates the Bankruptcy Code's objective to provide "the debtor 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Fleet Credit Card Servs. v. Macias* (*In re Macias*), 324 B.R. 181, 187 (Bankr. E.D.N.Y. 2004) (quoting *Cazenovia Coll. v. Renshaw* (*In re Renshaw*), 222 F.3d 82, 86 (2d Cir. 2000)).

7

"Any ambiguities as to whether the debt" satisfies an exception to discharge "must be resolved in favor of the debtor because, failure to obtain a discharge can result in a debtor's financial death sentence." *In re Rabinowitz*, 508 B.R. at 879 (internal quotations and citations omitted).

The Plaintiff relies on two separate exceptions to discharge: Section 523(a)(2)(A) and Section 523(a)(4). Section 523(a)(2)(A) provides that a debtor will not be discharged if a debt was for "money, property, [or] services . . . to the extent obtained by-- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ." 11 U.S.C. § 523(a)(2)(A). Turning to the first criteria under Section 523(a)(2)(A), false pretenses has been defined as "conscious deceptive or misleading conduct calculated to obtain, or deprive another of, property. It is the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the accomplishment of an unlawful objective." *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000). False pretenses also covers "implied misrepresentations or conduct intended to create and foster a false impression." *Id.* (citation omitted). To establish that a debt is non-dischargeable due to false pretenses, a plaintiff must show "(1) an implied misrepresentation or conduct by the defendant; (2) promoted knowingly and willingly by the defendant; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff; (4) which wrongfully induced the plaintiff to advance money, property, or credit to the defendant." *Lubit v. Chase (In re Chase)*, 372 B.R. 125, 128 (Bankr. S.D.N.Y. 2007) (citing *Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 12 (Bankr. S.D.N.Y. 2002)).

As to the second criteria under Section 523(a)(2)(A), false representation requires that the defendant "(1) made a false or misleading statement; (2) with the intent to deceive; and (3) in order for the plaintiff to turn over money or property to the defendant." *In re Chase*, 372 B.R. at

8

129 (citing *In re Dobrayel*, 287 B.R. at 12). "'[I]ntent to deceive' may be established through circumstantial evidence and inferred from the totality of the evidence presented." *Id*. (citing *H.K. Deposit & Guar. Ltd. v. Shaheen (In re Shaheen)*, 111 B.R. 48, 53 (S.D.N.Y. 1990)). The plaintiff must also establish that his reliance was justifiable. *Id.*; *see also Field v. Mans*, 516 U.S. 59, 61, 70–72 (1995) (holding standard under Section 523(a)(2)(A) is justifiable reliance). Whether justifiable reliance is established depends on "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case . . . ." *Field*, 516 U.S. at 71 (citation omitted); *see also Owens v. Owens (In re Owens)*, 2005 U.S. Dist. LEXIS 2300, at *7 (S.D.N.Y. Feb. 15, 2005).

As to the third non-dischargeability criteria in Section 523(a)(2)(A), actual fraud requires proof of the "five fingers of fraud." *In re Dobrayel*, 287 B.R. at 12 (citation omitted). Courts typically rely on the common law of torts, as embodied in the Restatement (Second) of Torts, in construing actual fraud. *See, e.g., Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 500 (Bankr. S.D.N.Y. 1999) (citing cases). The elements of common law fraud are "(1) a misrepresentation, (2) fraudulent intent, or *scienter*, (3) intent to induce reliance, (4) justifiable reliance and (5) damage." *Taub v. Morris (In re Morris)*, 252 B.R. 41, 48 (Bankr. S.D.N.Y. 2000). In construing fraud under Section 523(a)(2)(A), courts look to whether the debtor intended to perform at the time of the promise; if not, then the debtor had fraudulent intent, and the resulting debt is non-dischargeable (assuming the other elements of Section 523(a)(2)(A) are met). *See In re Alicea*, 230 B.R. at 501 (citing *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997)). However, if the debtor intended to perform "at the time he made the promise, but subsequently decided that he could or would not so perform, then his initial representation was not false when made," and thus, no fraudulent intent exists. *Id*.

9

The second discharge exception at issue here—Section 523(a)(4)—excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity . . . ." 11 U.S.C § 523(a)(4). To prevail under Section 523(a)(4), the plaintiff must establish that the debtor was a fiduciary and "was *acting* in a fiduciary capacity with respect to the particular conduct giving rise to the liability which is claimed to be non-dischargeable." *Zohlman v. Zoldan* (*In re Zoldan*), 221 B.R. 79, 87 (Bankr. S.D.N.Y. 1998) (internal quotations omitted); *see also In re Owens*, 2005 U.S. Dist. LEXIS 2300, at *9. But the "traditional or general meaning of fiduciary . . . is far too broad for the purposes of bankruptcy law." *In re Owens*, 2005 U.S. Dist. LEXIS 2300, at *11–12 (internal quotations and citation omitted); *see also In re Dobrayel*, 287 B.R. at 14 ("The meaning of 'fiduciary capacity' under Federal laws is more restricted than under the more general common law or state definitions."). In defining a fiduciary, bankruptcy courts apply federal law, *see Zohlman v. Zoldan*, 226 B.R. 767, 772 (S.D.N.Y. 1998), but state law remains relevant because bankruptcy courts "may look to state law to determine whether a trust exists." *Chitester v. Watterson* (*In re Watterson*), 524 B.R. 445, 451 (Bankr. E.D.N.Y. 2015). "Section 523(a)(4) applies only to express or technical trusts. Constructive or implied trusts, or any trust where the existence of the trust is created merely on the basis of wrongful conduct (a trust ex maleficio) do not create a fiduciary relationship." *Zohlman*, 226 B.R. at 772; *see also Race Place of Danbury, Inc. v. Scheller* (*In re Scheller*), 265 B.R. 39, 52 (Bankr. S.D.N.Y. 2001). Thus, under Section 523(a)(4), "the fiduciary relationship must exist prior to the act creating the debt; a trust relationship cannot be said to arise merely from the wrongful conduct itself." *Zohlman*, 226 B.R. at 773.

Assuming the debtor has acted while in a fiduciary capacity, the plaintiff must then show that the debtor committed fraud or defalcation for purposes of Section 523(a)(4). *See id.* at 775.

10

For the purposes of Section 523(a)(4), fraud is defined as it is for Section 523(a)(2)(A). *See Mirarchi v. Nofer* (*In re Nofer*), 514 B.R. 346, 355 (Bankr. E.D.N.Y. 2014) (stating "[t]he Bankruptcy Code incorporates the common law elements of fraud," and that Section 523(a)(4) "requires proof of the 'five fingers' of common law fraud"). "Defalcation" is defined as "any failure, innocent or otherwise, by a fiduciary to account for, or pay over, trust funds." *Semilof v. Waskew* (*In re Waskew*), 191 B.R. 34, 37 (Bankr. S.D.N.Y. 1995) (quoting *Peerless Ins. Co. v. Casey* (*In re Casey*), 181 B.R. 763, 766 (Bankr. S.D.N.Y. 1995)).

### B. The Plaintiff Failed to Establish the Non-Dischargeability of His Debt

Turning first to the Plaintiff's Section 523(a)(2)(A) claim, the Plaintiff advances his argument under a theory of false pretenses. The Plaintiff claims that Mr. Gallen's false pretenses led him to invest in L/P Services and sign the Guaranty when he would not otherwise have done so. *See* Trial Tr. 37:8–38:11. The Plaintiff claims that he "had an impression of Mr. Gallen as someone who made a lot of money, had a lot of money, knew how to make a lot of money, and that his expertise was greatly superior to mine in that area." Trial Tr. 68:14-17. At trial, Dr. Sharmat pointed to Mr. Gallen's "lavish office," home in East Hampton, BMW automobile, and his dining at expensive restaurants with Dr. Sharmat as evidence of his financial success and business expertise. *See* Trial Tr. 18:7–17, 48:4–5, 87:15–22. Additionally, Dr. Sharmat stated that Mr. Gallen told him "he had a wealthy practice, wealthy clients, and was an expert on wealth . . . ." Trial Tr. 18:8–9. Although Dr. Sharmat contends that Mr. Gallen's actions constituted "an implied misrepresentation," Dr. Sharmat has failed to prove that Mr. Gallen intended to create a false impression as required by the statute and applicable case law. *See In re Kovler*, 249 B.R. at 261; *In re Chase*, 372 B.R. at 128. Furthermore, the credible evidence does not demonstrate that Mr. Gallen "promoted knowingly and willingly" such impressions to

"wrongfully induc[e] the plaintiff to advance money, property, or credit to the defendant." *In re Chase*, 372 B.R. at 128. In fact, Dr. Sharmat candidly testified that "[a]ll [he] knew" of Mr. Gallen's professional credentials was that Mr. Gallen authored a book and was interviewed on television. Trial Tr. 69:1–6. But there is no evidence that either of these things is untrue.

The only potential false pretense based on the trial record might be Mr. Gallen's supposed statement that there was no obligation under the Guaranty if they have left the premises. But such an argument is doomed by the actual wording of the Guaranty, which laid out the parties' legal responsibilities, and was signed by Dr. Sharmat. *See* PX-3, Exh. C at 22–23; Trial Tr. 22:4–5. The Guaranty clearly set forth liability for 90 days after a notice to vacate was provided to the Landlord. *See* PX-3, Exh. C at 22–23. Although Dr. Sharmat never read the Guaranty, it was his choice not to do so. *See* Trial Tr. 22:17–23. He had the opportunity to read it or have others review the document for him. Dr. Sharmat did not present any evidence that Mr. Gallen somehow induced him not to read the Guaranty or that Mr. Gallen understood that Dr. Sharmat would not read it. Rather than any evidence of false pretenses, the credible evidence at trial shows that the parties simply took away different understandings from their conversations about the Guaranty. While Mr. Gallen understood that they would not be liable under the Guaranty as long as they had given the 90-day notice before vacating the premises, *see* Trial Tr. 43:5–13, 43:24–44:2, 90:14–17, Dr. Sharmat thought that the Guaranty would not be a concern if they were no longer on the premises. *See* Trial Tr. 24:5–7, 24:11–14. Thus, the evidence suggests an actual misunderstanding by the parties, not a "contrived and misleading understanding" on the part of Dr. Sharmat "which wrongfully induced [him] to advance money, property, or credit to the defendant." *In re Chase*, 372 B.R. at 128.

12

Other evidence undercuts the Plaintiff's Section 523(a)(2)(A) claim. More specifically, the evidence shows that Dr. Sharmat contemplated a business venture like L/P Services long before he met the Defendant. *See* Trial Tr. 16:15–16, 16:21–23, 59:6–14; DX-A1–A8 (e-mail communications regarding Dr. Sharmat's plans to open a diagnostic center dating back to June 2010). His detailed e-mails on the subject—and his trial testimony in general—demonstrate a sophistication at odds with the naiveté he claimed in this case about the Guaranty. All in all, therefore, the facts do not support the claim that Mr. Gallen employed a "scam, scheme, subterfuge, artifice, deceit or chicane" in his interactions with the Plaintiff. *See In re Kovler*, 249 B.R. at 261.[4]

For similar reasons, the Court reaches the same conclusion about the other two criteria of Section 523(a)(2)(A): false representation and actual fraud. The credible evidence does not satisfy the Plaintiff's burden of proof on either claim. The Plaintiff appears to argue that the Defendant misrepresented his credentials and financial wherewithal, which caused the Plaintiff to enter into a partnership with the Defendant and invest in L/P Services. *See* Trial Tr. 29:19–25, 87:10–88:4; Pl.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 43–45, 48. But as explained above, the evidence does not support that Mr. Gallen misrepresented his credentials. Moreover, there is nothing about the parties' agreement to support the Plaintiff's position. There is no operating agreement or any other written agreement as to how the business was to be operated. *See* Trial Tr. 20:3–9. Importantly, there is no writing in the record where the

---

[4] The Court notes that the Plaintiff appears to argue that false pretenses and a false representation may be found in relation to the Termination Agreement. Specifically, the Plaintiff claims that "a reasonable inference may be drawn" that at the time the Termination Agreement was entered into, Mr. Gallen "knew of his . . . own dire financial circumstances" and that any indemnification of the Plaintiff by Mr. Gallen or L/P Services was worthless. *See* Pl.'s Proposed Findings of Fact and Conclusions of Law ¶¶ 51, 59. However, no argument or evidence on this issue was presented at trial; rather, the evidence at trial focused on the Guaranty and Mr. Gallen's alleged misrepresentations to induce the Plaintiff to invest in L/P Services. Thus, the Court finds that this claim is not supported by the evidence.

Defendant makes representations about his credentials or financial wherewithal, much less one in which such representations served as a basis for the Plaintiff's decision to invest in L/P Services. In fact, the business was the Plaintiff's idea. The Plaintiff has thus failed to demonstrate that the Defendant had an intent to deceive, a requirement for both a false representation and fraud.

Dr. Sharmat's claim under Section 523(a)(4) fairs no better. Even assuming that Mr. Gallen's role in L/P Services would satisfy the fiduciary requirement, the evidence does not support a finding of fraud or defalcation. At trial, the Plaintiff complained about how little money Mr. Gallen had in his bank account at certain times. *See* Trial Tr. 84:10–13, 86:9–18. The Plaintiff also pointed to the fact that Mr. Gallen's East Hampton home was the subject of a foreclosure and that he was unable to maintain the lease on his BMW automobile. *See* Trial Tr. 87:10–14, 88:2–4. But the Plaintiff did not identify anything that required Mr. Gallen to have any specified amount of money available for their venture or what amount would have been sufficient. Once again, there is insufficient evidence to satisfy the statutory standard of fraud as to Mr. Gallen's credentials, the Guaranty, and the L/P Services business. Nor is there any evidence that the Defendant failed "to account for, or pay over, trust funds[,]" sufficient to satisfy the defalcation standard. *See In re Waskew*, 191 B.R. at 37. Indeed, when the Plaintiff requested to be bought out, the Defendant returned $50,000 to the Plaintiff under the Termination Agreement. *See* PX-6.

The Court credits both witnesses as being truthful and candid in explaining their genuine hopes for the success of the business and the reasons for its failure. In the end, it appears that their joint business venture was unsuccessful for the same reasons that many such ventures do not succeed: lack of planning, excessive optimism, insufficient time provided for the

business to succeed, and personal misfortune. But those reasons—and the facts here—do not satisfy the standards for non-dischargeability under Sections 523(a)(2)(A) or (a)(4).

## **CONCLUSION**

For the reasons set forth above, the Court rejects the Plaintiff's claims under Sections 523(a)(2)(A) and (a)(4) of the Bankruptcy Code, and finds that the debt owed to the Plaintiff is dischargeable in bankruptcy. Accordingly, the Court decides in favor of the Defendant. The Court will enter an order consistent with this Decision.

Dated: New York, New York
October 4, 2016

*/s/ Sean H. Lane*
UNITED STATES BANKRUPTCY JUDGE